UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYFT, INC.,<br><br>    *Plaintiff*,<br><br>   v.<br><br>THE CITY OF NEW YORK,<br><br>    *Defendant*. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Lyft, Inc. ("Lyft"), by and through its undersigned counsel, brings this Complaint against Defendant the City of New York ("City"), and alleges upon knowledge as to its own acts and upon information and belief as to all other matters as follows:

## INTRODUCTION

1. Lyft brings this action to challenge Local Law 52 of New York City of 2026 (the "Challenged Law")[1], which rewrites key terms of Lyft's freely executed contracts with drivers who utilize its platform, compromises Lyft's ability to prioritize the safety of riders and the public, and subjects Lyft to unfair and irrational adjudication procedures. The Challenged Law also opens the door to new causes of action against Lyft that seek to retroactively impose liability based on standards of conduct that did not exist at the time of the conduct at issue and run contrary to the contracting parties' settled expectations. The Challenged Law, which was enacted over Mayor Adams' veto, is hazardous and inequitable. It should be declared invalid and its enforcement

---

[1] Local Law 52 of New York City of 2026 (attached as Exhibit 1), https://legistar.council.nyc.gov/View.ashx?M=F&ID=15356081&GUID=0FCF5D71-0AA1-432B-9664-01DC832DC6B8

enjoined as unconstitutional under the United States and New York Constitutions.

2.    For years, Lyft, riders, and drivers have voluntarily entered into contractual agreements that govern their relationship. Among other things, those agreements provide the grounds and procedures that Lyft must follow when seeking to deactivate drivers from the platform. These terms, which the contracting parties have honored for years, are key to the success of the platform for Lyft, riders, and drivers alike. Under these contractual agreements, Lyft is able to intervene swiftly to deactivate drivers who pose a risk to public and rider safety, and drivers are afforded a process to appeal deactivations that they believe are not fair or justified.

3.    The Challenged Law disrupts years of settled expectations and upends Lyft's efforts to prioritize platform safety, and fairness and transparency towards drivers. It does so in service of an "unfair deactivation" crisis that some legislators have decried in political speeches, yet have never corroborated with basic facts. The following provisions of the Challenged Law could force Lyft to keep drivers on its platform, even where those drivers violated terms of the contracts that are meant to benefit all users.

4.    *First*, Sections 20-1282(a)-(e) (the "Deactivation Prohibitions") prohibit Lyft from deactivating drivers unless the deactivation falls within three, narrowly-drawn grounds; set new standards for fact-finders to determine whether Lyft had "just cause" to deactivate drivers; and require Lyft to notify offending drivers at least 14 days in advance of an impending deactivation in many instances. These prohibitions fundamentally rewrite the contractual terms that entitle Lyft to immediately deactivate drivers who pose a risk to rider and public safety or whose conduct threatens to disrupt Lyft's platform. Indeed, if a driver's behavior falls outside the City's narrow definition of "egregious misconduct," Lyft could be forced to keep that driver on the platform and eligible for rides, even where that behavior may implicate serious safety concerns.

5.      *Second*, Section 20-1283(a)-(c) (the "Retroactive Provision") applies the Deactivation Prohibitions retroactively back to 2019, and permits any driver deactivated over the past seven years to petition Lyft for reinstatement. Lyft must then prove that its prior decision meets a "just cause" standard that never existed at the time of the deactivation, using evidence that Lyft was never obligated to collect or retain. Under this unworkable standard, Lyft could be forced to reactivate drivers that it had justifiably removed from the platform.

6.      *Third*, Sections 20-1285(a)-(c), 20-1211(c), and 20-1208(c)(1) (the "Fact-Finding Provisions") grant deactivated drivers a private right of action to seek reinstatement, damages, and fees in a process governed by vague standards and one-sided evidentiary rules that severely undermine Lyft's ability to protect the integrity of its platform. This process is not only unjust; it also directly conflicts with the contractual agreement to resolve all deactivations through internal review.

7.      *Fourth*, Section 20-1286 (the "Compelled Reports Provision") requires Lyft to disclose sensitive and proprietary Lyft and rider data to deactivated drivers. Lyft would not otherwise disclose this information publicly, much less to drivers accused of misconduct, because this information could be used to interfere with Lyft's platform as well as riders' privacy and safety.

8.      All four provisions violate the Contract Clause in Article I, Section 10 of the United States Constitution because they rewrite the terms of Lyft's existing contracts, supplant the agreed-upon appeal processes, and fail to advance any legitimate public purpose.

9.      In addition to violating the Contract Clause, certain provisions of the Challenged Law also violate Lyft's other constitutional rights, including:

    a.      The Retroactive Provision violates Lyft's procedural due process rights and First Amendment rights of "expressive association." It violates procedural

3

due process by imposing an irrational and arbitrary seven-year lookback, exposing Lyft to potential liability with no justification or rational statutory goal. And by forcing Lyft to associate with drivers it has already chosen to deactivate for engaging in conduct contrary to its agreements, the Retroactive Provision burdens Lyft's First Amendment right of association.

b. The Fact-Finding Provisions violate procedural due process because they employ one-sided standards and rules that hamstring Lyft's ability to defend itself.

c. The Compelled Reports Provision violates the First Amendment by compelling Lyft to disclose sensitive and proprietary information, and in doing so, express views on privacy, safety, and discipline that are contrary to its values.

d. The Challenged Law as a whole violates Due Process because it is impermissibly vague and deprives Lyft of equal protection under the law.

10. Accordingly, the Challenged Law should be declared invalid and enjoined before it can begin inflicting constitutional injury on Lyft and other high volume for-hire vehicle services ("HVFHVS").

## THE PARTIES

11. Plaintiff Lyft is incorporated in Delaware with headquarters in San Francisco, California. Lyft operates transportation networks in the United States and internationally that offer access to transportation options through the Company's platform and mobile-based application.

12. Defendant the City of New York is a municipal entity created and organized under the laws of the State of New York.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Lyft alleges violation of its rights under the United States Constitution.

14. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims arising under the New York State Constitution because they are related to the

federal claims asserted in this action such that they form part of the same case or controversy under Article III of the U.S. Constitution.

15.    The Court may declare the legal rights and obligations of the parties in this action pursuant to 28 U.S.C. § 2201 because the action presents an actual case or controversy within the Court's jurisdiction.

16.    Venue in this District is proper under 28 U.S.C. § 1391 because Defendant is located and resides in this judicial district and in the State of New York, and because a substantial part of the events giving rise to the claims for relief occurred in this District, or in the alternative, because Defendant is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**I.    Lyft, Drivers, and Riders Freely Enter into a Contractual Relationship with Transparent Deactivation Terms**

17.    Lyft's relationship with drivers and riders is governed by contract. Each driver voluntarily chooses to enter the relationship by agreeing to "Terms of Service" that constitute a "legally binding agreement" with Lyft.[2] The "Terms of Service," together with incorporated and referenced guidelines, policies, and addenda ("Agreement"), establish the terms governing Lyft's relationship with drivers and riders utilizing its platform.

18.    As described below, Section 16 of the Agreement specifies the grounds and procedures for deactivating a driver from Lyft's platform (the "Deactivation Terms"), which are rooted in Lyft's careful balancing of public and rider safety with driver access. By entering into the Agreement, drivers expressly agree to be bound by those Deactivation Terms.

**A.    The Deactivation Terms are Transparent and Fair**

19.    Pursuant to the Deactivation Terms, drivers have the right to terminate the

---

[2]    *Lyft Terms of Service*, Lyft (attached as Exhibit 2), https://www.lyft.com/terms (last accessed June 2, 2026).

Agreement "without cause, upon seven (7) days' prior written notice to Lyft."[3] Lyft, by contrast, has carefully defined rights to terminate the Agreement and deactivate drivers from its platform.

20.    Under the Deactivation Terms, Lyft may deactivate drivers, after providing notice and an opportunity to cure, if: (1) a driver ceases to qualify as a user, (2) a driver ceases to qualify to provide rideshare services or to operate the approved vehicle under applicable law, (3) a driver falls below Lyft's star rating threshold, or (4) Lyft has the good-faith belief that such action "is necessary to protect the safety of the Lyft community."[4] If the issue is "cured in a timely manner and to Lyft's satisfaction," Lyft will not permanently terminate the Agreement.[5] In some cases, "such as expired documents," drivers can complete remediation steps (*i.e.*, cure their breach) through the Lyft app.[6]

21.    Drivers and Lyft agree that Lyft may deactivate drivers immediately and without notice for violations of Sections 9 and 10(a)-(i) of the Agreement.[7] In Section 9, users agree not to engage in certain enumerated "restricted activities," which include conduct that threatens the safety of users (*i.e.*, stalking, harassment, discrimination, sexual assault, and fraud) and conduct that undermines the operability of Lyft's platform and business (*i.e.*, installing malware, scraping Lyft data, forging user identification, and selling user accounts).[8] In Section 10, drivers represent that they are competent, licensed, and insured to drive, and agree, among other things, not to "defraud Lyft or Riders on the Lyft Platform."[9] If drivers materially breach these covenants, Lyft may deactivate them without notice.

---

[3]    *Id.* § 16 Term and Termination.
[4]    *Id.*
[5]    *Id.*
[6]    *Deactivations*, Lyft (attached as Exhibit 3), https://help.lyft.com/hc/en-us/all/articles/7366276697-Deactivations#Deactivation (last accessed June 2, 2026).
[7]    *Lyft Terms of Service* § 16 Term and Termination, Lyft, https://www.lyft.com/terms (last accessed June 2, 2026).
[8]    *Id.* § 9 Restricted Activities.
[9]    *Id.* § 10 Driver Representations, Warranties and Agreements.

22.     For potential violations of the Agreement relating to safety incidents, Lyft follows an investigation and deactivation process.[10] If Lyft determines it is warranted to protect the safety of the platform, Lyft first puts the driver's account on a temporary hold while Lyft investigates, during which time both the rider and driver may submit evidence.[11] Lyft notifies the driver of the hold and requests relevant information to aid in Lyft's investigation. The driver is unable to accept new trip requests during this hold period. The driver and rider can "request a phone call with the agent conducting the investigation" to provide their account of the events and ask questions about the process.[12] Once the investigation is complete, Lyft notifies the driver of the final decision— either that the allegations have not been substantiated and no action is warranted, the allegations warrant a warning on the driver's account, or that the driver's account has been permanently deactivated.[13]

23.     Lyft also provides a process for drivers to appeal permanent deactivations.[14] Through this process, drivers may include "additional information regarding the deactivation (such as dash cam footage, photos, police reports, etc.)" in their appeal petition.[15] Appeals are heard by agents who were not involved in the underlying investigation and deactivation. These agents review the appeal to "determine whether to uphold or overturn" the permanent deactivation.[16]

24.     In addition to the above, drivers may pursue claims related to their deactivation through binding private arbitrations, in a process agreed upon and described in Section 17 of the

---

[10]   *Deactivations*, Lyft, https://help.lyft.com/hc/en-us/all/articles/7366276697-Deactivations#Deactivation (last accessed June 2, 2026).
[11]   *Id.*
[12]   *Id.*
[13]   *Id.*
[14]   *Appealing permanent deactivations*, Lyft (attached as Exhibit 4), https://help.lyft.com/hc/en-us/all/articles/5354487457-Appealing-permanent-deactivations (last accessed June 2, 2026).
[15]   *Id.*
[16]   *Id.*

Agreement.[17]

**B.    The Deactivation Terms Balance Public and Rider Safety with Driver Access**

25.    The Deactivation Terms described above embody Lyft's careful balancing of public and rider safety with driver access to the platform.

26.    On the one hand, Lyft is relentlessly committed to safety, describing it as the company's "highest priority."[18] To that end, during each ride, riders and drivers have access to in-app safety tools, including location sharing, audio recording, and the option to schedule a check-in from Lyft upon arrival.[19] Lyft also monitors rides for certain unusual activity and checks in with riders and drivers in those circumstances, and safety teams are available to assist riders and drivers by phone or chat 24/7.[20] Lyft also holds drivers and riders alike accountable to its commitments to user safety. Through its Community Guidelines, Lyft asks all users to "put safety first" and hold themselves "accountable to everyone in the car."[21] This emphasis on safety benefits drivers by generating greater demand from riders.

27.    At the same time, Lyft is also committed to—and benefits from—maintaining fair driver access to its platform and to fair deactivation and appeals policies.[22] Lyft takes the decision to deactivate drivers seriously, and has acknowledged that "fair deactivations are important."[23] After all, riders using Lyft rely on drivers to meet the demands of the trips they are seeking through

---

[17]    *Lyft Terms of Service*, Lyft, at § 17 Dispute Resolution and Arbitration Agreement, https://www.lyft.com/terms (last accessed June 2, 2026).

[18]    *Report a safety incident or citation*, Lyft (attached as Exhibit 5), https://help.lyft.com/hc/en-us/all/articles/115013077888 (last accessed June 2, 2026); *see generally Safety*, Lyft, (attached as Exhibit 6) https://www.lyft.com/safety (last accessed June 3, 2026).

[19]    *How Lyft Works to Keep Riders Safe*, Lyft (attached as Exhibit 7), https://www.lyft.com/safety/rider (last accessed June 2, 2026); *How Lyft Works to Keep Drivers Safe*, Lyft (attached as Exhibit 8), https://www.lyft.com/safety/driver (last accessed June 2, 2026).

[20]    *How Lyft Works to Keep Riders Safe*, Lyft, https://www.lyft.com/safety/rider (last accessed June 2, 2026); *How Lyft Works to Keep Drivers Safe*, Lyft, https://www.lyft.com/safety/driver (last accessed June 2, 2026).

[21]    *Community guidelines*, Lyft (attached as Exhibit 9), https://www.lyft.com/safety/community-guidelines (last accessed June 2, 2026).

[22]    Letter from Jerry Golden to N.Y.C. Council (Sept. 22, 2025) (attached as Exhibit 10).

[23]    Transp. & Infrastructure Comm. Hr'g Test. at 55-56 (Sept. 27, 2024) (attached as Exhibit 11).

the Lyft platform.

28.     The Deactivation Terms strike the right balance between these two interests. When safety or the integrity of the platform are at risk, the balance skews in favor of swift intervention. Lyft's right to deactivate offending drivers immediately is critical to its ability to maintain the safety standards that benefit all users of the platform. And even in these circumstances, drivers still may be heard along multiple points in the deactivation process: they can submit evidence during the investigation, speak with investigators, and appeal a permanent deactivation to a safety agent. When the allegation is less severe, Lyft provides drivers notice and the opportunity to address and cure instances of non-compliance with the Agreement.

29.     As Lyft has explained, "[b]alancing the safety of all riders using the Lyft platform while allowing drivers to continue contributing to Lyft's community and earning money is fundamental to [Lyft's] business."[24] The current Deactivation Terms reflect this balance, granting drivers robust deactivation and appeals procedures while empowering Lyft to act quickly in the interest of rider and public safety.

## II.     The City Council Enacts the Challenged Law Aiming to Create a Presumption That All Deactivations Are Unlawful

30.     For years, the New York Taxi Workers Alliance ("NYTWA") has lobbied against Uber and Lyft's deactivation policies, claiming—without basis—that drivers were being "fired with no just cause or way to appeal."[25] That claim was and is untrue and directly contradicted by Lyft's own Deactivation Terms and practices.

31.     In February 2024, City Council Member Shekar Krishnan introduced a bill (Intro

---

[24]    Letter from Jerry Golden to N.Y.C. Council (Sept. 22, 2025).
[25]    *NYTWA Campaign: Job Security for App Drivers*, NYTWA (attached as Exhibit 12), https://www.nytwa.org/deactivation (last accessed June 2, 2026) (quoting since-removed X post by user @nicoemoe).

0276-2024 or the "Bill"), which would later become the Challenged Law.[26] Public reports credit the NYTWA with "draft[ing]" and "inspiring" the Bill.[27]

32.     When Mr. Krishnan discussed the Bill during a hearing in September 2024, he parroted NYTWA's language, sometimes verbatim. Mr. Krishnan explained that the Bill's animating principle was to address what he labeled "unfair deactivations," claiming that drivers "are unfairly deactivated" and "forced into a company driven appeals process where the companies have the upper hand and make the final decision with no real meaningful process, with no notice in advance and no real reasons listed [or] publicly available standard for what constitutes a fair reason for deactivation."[28] He conceded that the Bill targeted Uber and Lyft specifically, stating it would protect "the livelihoods of Uber [and] Lyft drivers" from being "thrown into chaos when they are deactivated from Uber and Lyft with little to no advanced warning."[29]

33.     At the same hearing, NYTWA's Executive Director acknowledged that the Bill's goal was to create a presumption that deactivations were unlawful and require Uber and Lyft to prove otherwise.[30] Mr. Krishnan echoed that goal, describing the Bill as seeking to "shift[] the burden from the driver . . . [to] for-hire vehicle companies to justify why the deactivation was necessary."[31]

34.     In considering the Bill, the City Council did not focus on, much less consider, any

---

[26]    Int. No. 0276-2024, N.Y.C. Council Legislative Research Center, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563 (last accessed June 8, 2026).

[27]    *See* Amir Khafagy, *Uber-Backed Group Opposes Bill to Protect Drivers From Unfair Deactivations*, Documented (Sept. 30, 2025), (attached as Exhibit 13), https://documentedny.com/2025/09/30/uber-backed-group-opposes-bill-to-protect-drivers-from-unfair-deactivations/.

[28]    Transp. & Infrastructure Comm. Hr'g Tr. 22:7-14 (Sept. 27, 2024) (attached as Exhibit 14).

[29]    *Id*. at 21:11-13.

[30]    *Id*. at 53:21-54:2; *see also Council Member Krishnan and NYTWA Celebrate Passage of Most Comprehensive Just Cause Protection Law in The Nation for App-Based Drivers*, NYTWA (Dec. 19, 2025), (attached as Exhibit 15) https://myemail.constantcontact.com/RELEASE—Krishnan---NYTWA-Celebrate-Passage-Just-Cause-Law-for-NYC-Uber---LyftDrivers.html?soid=1101912670699&aid=nRSQxpStqIo.

[31]    Transp. & Infrastructure Comm. Hr'g Tr. 24:5-9 (Sept. 27, 2024).

10

actual data about "unfair deactivations." Instead, the purported "evidentiary" basis for the supposed plague of unfair deactivations were anecdotes from a handful of deactivated drivers.[32] Undeterred by the lack of evidence, City Council members backed the Bill by mischaracterizing Lyft's deactivation procedures and engaging in generalized attacks on big business. For example, Harvey Epstein, a member of the New York City Council, decried that drivers were "at the mercy of billionaire tech companies who can deactivate their accounts on a whim."[33] Council member Shahana Hanif added that "No one should live in fear of being deactivated by a faceless algorithm."[34] And Mr. Krishnan characterized the law as "setting an important national precedent for drivers, giving labor more power and holding megacorporations accountable."[35] The Bill's advocates further trumpeted it as "starting a nationwide movement"[36] and representing the "first time that drivers will have rights codified in the law" relating to deactivation standards.[37]

35.    Lyft opposed the Bill, but not because it disagreed with the goal of ensuring fair deactivations. To the contrary, Lyft acknowledged that "fair deactivations are important," as reflected in Lyft's existing investigation and appeals process. As Lyft's then-Public Policy Manager, Larry Gallegos, testified during a committee hearing, the existing process resolved over 70% of driver deactivations within 24 hours.[38] Lyft objected to the Bill because it failed to consider the adequacy of Lyft's existing processes, and created a presumption that all deactivations were unlawful, at the expense of all other considerations, including rider and public safety. While "fair

---

[32]    *See, e.g.*, *id.* at 115:4-17; 115:19-116:22; 120:3-121:8; 121:10-122:15; 136:16-137:24; 138:22-139:20; 143:20-144:13; 194:3-195:13; 195:15-197:4; 197:10-24; 222:12-21; 223:8-224:8; 239:2-24.

[33]    *Council Member Krishnan and NYTWA Celebrate Passage of Most Comprehensive Just Cause Protection Law in The Nation for App-Based Drivers*, NYTWA (Dec. 19, 2025), https://myemail.constantcontact.com/RELEASE—Krishnan---NYTWA-Celebrate-Passage-Just-Cause-Law-for-NYC-Uber---Lyft-Drivers.html?soid=1101912670699&aid=nRSQxpStqIo

[34]    *Id.*

[35]    Transp. & Infrastructure Comm. Hr'g Tr. 6:13-15 (Dec. 18, 2025) (attached as Exhibit 16).

[36]    *Id.* at 6:8-9.

[37]    Transp. & Infrastructure Comm. Hr'g Tr. 52: 6-7 (Sept. 27, 2024).

[38]    Transp. & Infrastructure Comm. Hr'g Test. at 55-56 (Sept. 27, 2025).

11

deactivations are important," Mr. Gallegos explained, they must be achieved "without jeopardizing the safety of the public."[39]

36.    In a letter sent to the City Council the next year, Lyft expanded on these concerns, explaining that the proposed fact-finding procedures—which required Lyft to justify deactivations—endangered passengers and the public in two ways: first, by requiring riders to relive difficult experiences during investigations, and second, by compelling reinstatement of drivers solely based on evidentiary shortcomings, such as when a complaining rider is unwilling to participate.[40] Lyft also warned that the Bill would prevent Lyft "from promptly removing drivers who have been reported as engaging in unsafe conduct."[41] Lyft reiterated that its existing deactivation and appeals policies already achieved the goals of the Bill and better served the public by ensuring fair treatment for drivers without jeopardizing rider safety.[42]

37.    Community groups echoed these concerns. In an editorial, the National Federation of the Blind of New York ("NFB") and the National Association of Guide Dog Users urged the Council to reconsider the Bill because it "significantly restrict[ed] rideshare companies' ability to deactivate bad and unsafe drivers accused of serious misconduct."[43] In NFB's and other advocates' view, "such drivers must face immediate deactivation, so consequences fall on the violator, not the victim."[44] As NFB put it, the Council was "wrong" to "prioritize driver job security over passenger protections."[45]

38.    The Council also failed to consider the costs and burdens associated with the Bill's

---

[39]    *Id.* at 54.
[40]    Letter from Jerry Golden to N.Y.C. Council (Sept. 22, 2025).
[41]    *Id.*
[42]    *Id.*
[43]    Albert Elia, *NYC rideshare deactivation bill hurts the blind*, N.Y. Daily News (Oct. 2, 2025), (attached as Exhibit 17) https://www.nydailynews.com/2025/10/02/nyc-rideshare-deactivation-bill-hurts-the-blind/.
[44]    *Id.*
[45]    *Id.*

proposed fact-finding processes. The Mayor's Office separately estimated that the Bill would require a new compliance division of 170 staff, costing the City $23,048,000 annually to review an assumed 2,000 cases per year.[46]

39.     Ultimately, proposals to modify the Bill to address safety concerns were rejected. Most tellingly, a committee report advised that the final definition of "egregious misconduct" might not extend to all "conduct that endangers others" because that would be "over-inclusive."[47] A proposal that would allow companies' "reasonable belief of misconduct" to justify deactivations was also rejected.[48]

40.     On December 18, 2025, the Council passed the amended version of the Bill.[49]

41.     On December 31, 2025, Mayor Eric Adams vetoed the bill, noting that it would "second-guess business decisions regarding independent contractors," "create regulatory confusion," and come "with a high cost."[50]

42.     On January 29, 2026, the Council voted to override the veto and enact the Bill into law.[51] The Challenged Law will take effect on July 28, 2026.

## III.    The Challenged Law Interferes with Lyft's Contracts and Violates Lyft's Due Process and First Amendment Rights

43.     The Challenged Law amends chapter 12 of title 20 of the administrative code of the City by adding a subchapter titled "WRONGFUL DEACTIVATION OF HIGH VOLUME FOR-HIRE VEHICLE DRIVERS," as well as revising certain existing provisions of chapter 12 to

---

[46]    Fiscal Impact Statement of the N.Y.C. Mayor's Off. of Mgmt. & Budget (Dec. 15, 2025) (attached as Exhibit 18).
[47]    Transp. & Infrastructure Comm. Report at 12-13 (Dec. 18, 2025) (attached as Exhibit 19).
[48]    *Id.* at 15.
[49]    Int.    No.    0276-2024,    N.Y.C.    Council    Legislative    Research    Center, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563 (last accessed June 8, 2026).
[50]    Letter from Eric Adams to City Clerk (Dec. 31, 2025) (attached as Exhibit 20).
[51]    Int.    No.    0276-2024,    N.Y.C.    Council    Legislative    Research    Center, https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563 (last accessed June 8, 2026).

include HVFHVS drivers.[52]

44.     The Challenged Law consists of four groups of related provisions:

    a. The Deactivation Prohibitions specify three, narrowly-drawn grounds for deactivating drivers, and require 14 days' advance notice in many instances.[53]

    b. The Retroactive Provision applies the Deactivation Prohibitions going back to 2019, and permits previously deactivated drivers to seek reinstatement.[54]

    c. The Fact-Finding Provisions grant deactivated drivers the right to challenge their past and present deactivations in a process governed by vague standards and one-sided evidentiary rules that create a presumption of reinstatement and back pay.[55]

    d. The Compelled Reports provision forces Lyft to disclose sensitive and proprietary information to deactivated drivers that it otherwise would choose not to convey.[56]

45.     As described below, these provisions interfere with Lyft's contracts in violation of the Contract Clause and violate Lyft's due process and speech rights under the United States

---

[52]    The Challenged Law incorporates the definition of "high-volume for-hire service" from New York City Administrative Code § 19-502(gg): "an individual, partnership, limited liability company, business corporation, sole proprietorship or any combination of one or more individuals, partnerships, limited liability companies, business corporations or sole proprietorships operating under, or in affiliation with, one brand or trade name or a common brand, trade, business or operating name, that offers, facilitates or otherwise connects passengers to for-hire vehicles by prearrangement, including through one or more licensed black car bases, luxury limousine bases or livery base stations, as these terms are defined in section 51-03 of title 35 of the rules of the city of New York, utilizing software that allows a passenger or prospective passenger to arrange for transportation using a passenger-facing booking tool, including a smartphone or other electronic device, and that dispatches, or facilitates the dispatching of, 10,000 or more trips in the city in one day. Any and all bases using a common brand, trade, business or operating name will be considered together for purposes of determining whether they satisfy the definition of high-volume for-hire service."

[53]    Local Law 52 of New York City of 2026 § 20-1282(a)-(e).

[54]    Id. § 20-1283(a)-(b).

[55]    Id. §§ 20-1285, 20-1211(c), 20-1208(c)(1).

[56]    Id. § 20-1286.

Constitution and New York Constitution.

### A.       The Deactivation Prohibitions Rewrite Lyft's Deactivation Terms

*1.       The Deactivation Prohibitions impose narrow grounds for deactivation*

46.       The Deactivation Prohibitions establish that an HVFHVS "shall not deactivate" a driver "except for" three reasons: (1) "just cause," (2) "a bona fide economic reason," or (3) "where federal, state, or local law or rule" requires deactivation.[57]

47.       Only three types of driver behavior would satisfy the "just cause" standard: (a) "egregious misconduct," (b) a failure to satisfactorily "perform their job duties," or (c) "misconduct that is demonstrably and materially harmful" to the HVFHVS.[58]

48.       For non-egregious conduct, an HVFHVS cannot demonstrate "just cause" <u>unless</u> it first has utilized "progressive discipline," which is defined as "a disciplinary system that provides for a graduated range of reasonable disciplinary measures, including but not limited to warnings and further training requirements."[59] However, an HVFHVS still cannot demonstrate "just cause" if the "progressive discipline" it identifies was issued more than a year before the deactivation.[60]

49.       The "progressive discipline" requirement is vaguely defined, making it difficult for Lyft to implement. For example, it is not clear whether Lyft's existing warning procedure would suffice or what procedures Lyft would need to adopt to comply. The "progressive discipline" requirement is further ill-suited to the nature of Lyft's business. Lyft can either grant access or remove access to the platform. Lyft does not have the type of ongoing relationship with individual drivers that would allow for intermediate disciplinary steps, and the rule provides no guidance as to what such a system would need to look like to satisfy the "progressive discipline" standard.

---

[57]    *Id.* § 20-1282(a).
[58]    *Id.* § 20-1281.
[59]    *Id.*
[60]    *Id.* § 20-1282(c).

15

50. The one-year lookback limit compounds these problems. By prohibiting an HVFHVS from relying on an instance of "progressive discipline" issued more than one year before a deactivation, the rule effectively requires Lyft to keep drivers on the platform despite repeated instances of misconduct, so long as those instances are sufficiently spread out over time. A driver who engages in repeated fraud, for example, would be insulated from deactivation simply because each individual incident fell more than a year before the deactivation decision. The Council identified no rationale for why one year of compliant behavior should erase prior misconduct that would otherwise constitute "just cause" for deactivation.

2.    *The Deactivation Prohibitions compromise Lyft's ability to immediately deactivate drivers in the interest of safety*

51. Under the Deactivation Prohibitions, an HVFHVS may only immediately deactivate a driver "where a deactivation is for egregious misconduct, account sharing, or if there is a pattern of repeated fraudulent behavior."[61] The Challenged Law defines "egregious misconduct" to mean "(i) conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault or (ii) discrimination in violation of federal, state, or local law."[62] Within five days of an immediate deactivation, the HVFHVS must provide a "notice of deactivation" to the deactivated driver with a written explanation of the "precise and detailed reasons for such deactivation."[63]

52. For all other "just cause" grounds, an HVFHVS must provide drivers "with notice of an impend[ing] deactivation 14 days in advance of the impending deactivation."[64] This written notice must state "all the precise and detailed reasons for and the effective date of such

---

[61]    *Id.* § 20-1282(d).
[62]    *Id*. § 20-1281.
[63]    *Id*. § 20-1282(e).
[64]    *Id*. § 20-1282(d).

16

deactivation."[65]

53.    The Deactivation Prohibitions rewrite the considered and balanced Deactivation Terms in Lyft's contracts with drivers and riders. Under these contracts, Lyft has the right to immediately deactivate drivers who pose a risk to rider or public safety, or whose conduct threatens to disrupt Lyft's platform and service. These grounds are enumerated and broad enough to empower Lyft to maintain its service and uphold the safety standards that benefit all users of the platform.

54.    The Deactivation Prohibitions, on the other hand, restrict immediate deactivations to "egregious misconduct" (*i.e.*, conduct that poses imminent danger to other persons or discrimination), account sharing, and "repeated fraudulent behavior." This means that Lyft must keep drivers on the platform for 14 days even where there is "just cause" to deactivate them, including because a driver has violated its contracts with Lyft in a way that does not rise to the level of "egregious misconduct."

55.    For example, under the Deactivation Terms in Lyft's existing contracts, Lyft could immediately deactivate a driver carrying a weapon on the grounds that such conduct is a "restricted activity" per Section 9.b. of the Agreement. But under the Challenged Law, carrying a weapon is likely not "egregious misconduct," meaning that Lyft must keep the driver connected to the platform and eligible for trips for 14 days. As another example, Lyft could immediately deactivate a driver for recklessly crashing his car, but could not do the same under the Challenged Law because a past instance of reckless driving is likely not "egregious misconduct."

56.    These are two of many potentially risky outcomes of the Challenged Law. In place of Lyft's balanced approach, the Challenged Law skews in favor of unfettered driver access to

---

[65]    *Id.*

Lyft's proprietary platform. Requiring Lyft to retain these drivers on its platform compromises Lyft's ability to prioritize safety for its users.

**B.     The Retroactive Provision Irrationally and Arbitrarily Applies the Deactivation Prohibitions Retroactively to 2019**

57.     The Retroactive Provision allows drivers subject to deactivation in the past seven years to "petition" for reinstatement any time within a one-year period following the Challenged Law's effective date.[66] For each "petition," Lyft has 30 days to reinstate the petitioning driver unless it determines that its past deactivation decision would comply with the "just cause" standard that did not then exist.[67] If Lyft does not reinstate a deactivated driver, it must provide a written explanation "of all the precise and detailed reasons for such prior deactivation."[68]

58.     The Council did not explain why it chose to apply the Challenged Law retroactively, much less why it chose a seven-year lookback period. Nor did the Council consider that Lyft—and the City—would have to shoulder immense costs and resources to reinvestigate and re-adjudicate deactivation decisions from the past seven years, each of which took place when Lyft had no expectation that its decisions must meet this newly-formulated "just cause" standard.

59.     Indeed, for the past seven years, Lyft reasonably understood that its deactivation decisions must comply with the Agreement. As a private-sector business, Lyft operated in accordance with the terms of its contracts with drivers and riders, and made reasonable business judgments about who could access its proprietary technology and platform. Once effective, the Retroactive Provision stands to unravel years of settled transactions and expectations between Lyft, drivers, and riders.

60.     Like the Deactivation Prohibitions, the Retroactive Provision also skews too far in

---

[66]   *Id.* § 20-1283(a).
[67]   *Id.*
[68]   *Id.* § 20-1283(c).

favor of driver reactivation. If Lyft cannot reproduce evidence that justified a years'-old deactivation, or if the evidence it has retained does not satisfy a "just cause" standard that did not exist at the time of deactivation, Lyft must reactivate the former driver, no matter how legitimate or justified the reasons for deactivation. By forcing Lyft to reactivate drivers based on paperwork issues when Lyft had previously determined those drivers posed credible safety risks, the Challenged Law not only forces Lyft to degrade its safety priorities but also risks public safety.

### C.     The Fact-Finding Provisions are Irrational, Vague, and Unfair

61.     The Fact-Finding Provisions grant deactivated drivers the right to challenge their past and present deactivations in a process governed by vague standards and one-sided evidentiary rules.

62.     Section 20-1211 creates a private right of action, purportedly authorizing deactivated drivers to challenge their deactivations "in any court of competent jurisdiction" and seek reinstatement, costs, punitive damages, compensatory damages, and back pay. Alternatively, under Section 20-1208, deactivated drivers may file a complaint with the Department of Consumer and Worker Protection (the "Department"), which investigates the complaint, "if resources permit," and may order reinstatement, back pay, and civil penalties.

63.     In either forum, the HVFHVS bears the burden of proving "just cause" by a preponderance of the evidence.[69] The fact-finder is barred from considering "any reasons" for deactivation that were "not included in the notice of deactivation," while the deactivated driver is free to submit any evidence—even if it was "not provided to the HVFHVS" at the time it was considering whether there was just cause for deactivation.[70]

64.     In evaluating whether a deactivation satisfies the "just cause" standard, fact-finders

---

[69]    *Id.* § 20-1285(a).
[70]    *Id.* § 20-1285(b).

are directed to consider seven subjective and vague factors, such as whether: the "policy, rule or practice that forms a basis for such deactivation" was "reasonable and applied consistently"; "utilization of progressive discipline" was "reasonable and applied consistently"; and the deactivation was the result of a "fair and objective investigation" and is a "reasonable response" to the conduct and "accounts for any mitigating circumstances."[71]

65.    The Fact-Finding Provisions supplant the appeal provisions agreed upon in Lyft's contracts. Under the Agreement, drivers may appeal deactivation decisions to a safety agent that will review all available evidence.[72] As before, these Agreement provisions strike the proper balance between rider and public safety and driver access: on the one hand, Lyft is able to fully and finally deactivate drivers credibly accused of misconduct while on the other, drivers have access to appeal their deactivations.

66.    The Challenged Law upsets this balance by allowing drivers to challenge deactivations before multiple fact-finders and under one-sided rules. The Fact-Finding Provisions artificially shield fact-finders from considering all evidence relevant to the actual question: whether Lyft had "just cause to deactivate a driver." In this way, Lyft will be severely hamstrung in its ability to defend itself with all the evidence it considered, including if some of that evidence was not disclosed to the deactivated driver in a particular document and for a sensible reason (for example, to protect the identity of a witness). Drivers, by contrast, can present all relevant evidence, allowing fact-finders to consider potentially exculpatory facts that were never presented to Lyft and so could not inform Lyft's decision making. This uneven and biased process impedes, rather than promotes, fact-finding and fair adjudication.

---

[71]    *Id*. § 20-1282(b).

[72]    *Appealing permanent deactivations*, Lyft, https://help.lyft.com/hc/en-us/all/articles/5354487457-Appealing-permanent-deactivations (last accessed June 2, 2026).

67.    The Fact-Finding Provisions create a heavy presumption that Lyft unlawfully deactivated drivers and then curtail Lyft's ability to rebut that presumption. The end result is that Lyft will be unfairly forced to reactivate drivers who were fairly and justifiably deactivated from the platform.

**D.    The Compelled Reports Provision Requires Lyft to Disclose Sensitive and Proprietary Information**

68.    Upon the issuance of a notice to a driver deactivated for "egregious misconduct" or to a driver whose prior deactivation is upheld, the Compelled Reports Provision requires Lyft to provide the deactivated driver with the following "information and data relevant" to the deactivation:

    a.    "Driving performance data specific to such high-volume for-hire vehicle driver;"

    b.    "All customer comments, ratings, and complaints received regarding the high-volume for-hire vehicle driver;" and

    c.    "Anonymized and aggregated reports, covering the 12 months prior to such high-volume for-hire vehicle driver's deactivation, regarding discipline, including deactivation, imposed by such high-volume for-hire vehicle service on any other high-volume for-hire vehicle drivers who engaged in the same or similar misconduct or failure to satisfactorily perform job duties forming a basis for the deactivation of the high-volume for-hire vehicle driver subject to such notice."[73]

69.    Lyft does not provide these Compelled Reports to drivers in the normal course of business and would not choose to do so. While the Provision requires Lyft to remove personally identifiable information about riders, the reports will necessarily include contextual details that may risk rider reidentification. Lyft does not wish to risk even a chance of rider reidentification. Regardless, the unredacted data will still contain confidential and sensitive information that Lyft would not otherwise disclose. For example, if Lyft deactivated the driver for fraudulent activity, it

---

[73]    *Id.* § 20-1286(a).

would be forced to turn over data that could reveal Lyft's fraud-prevention systems, effectively giving the offending driver the roadmap to commit more fraud.

**IV.    The Challenged Law Irreparably Harms Lyft**

70.    The Challenged Law is set to take effect on July 28, 2026.

71.    If the Challenged Law becomes effective, Lyft immediately will suffer at least two types of irreparable harm. First, the Challenged Law will deprive Lyft of its constitutional rights, including the protections afforded by the Contract Clause, the Due Process Clause, and the First Amendment. From the moment the law first becomes effective, Lyft will endure constitutional injury that cannot be compensated by money damages—even if the Law is later declared unconstitutional.

72.    Second, the Challenged Law will irreparably damage Lyft's customer relations, reputation, and goodwill. The Challenged Law will abrogate Lyft's right to immediately deactivate drivers flagged for safety-related violations of the Agreement. The Challenged Law will also force Lyft to reactivate drivers that Lyft had previously determined posed credible safety risks. Lyft can never be made whole from the resulting loss of its reputation, even if the Challenged Law is later declared unconstitutional.

## COUNT I: Contract Clause Violation

**(Declaratory and Injunctive Relief for Violation of the Contract Clause of the United States Constitution (42 U.S.C. § 1983) as to the Challenged Law)**

73.    The Contract Clause prohibits state and local governments from "pass[ing] any . . . Law impairing the Obligation of Contracts." U.S. Const., art. I, § 10, cl. 1. The Contract Clause limits the power of a state or local government "to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).

22

74.     The Challenged Law violates the Contract Clause by rewriting the Deactivation Terms of Lyft's existing contracts with drivers to impose new substantive and procedural requirements. Lyft's existing Deactivation Terms are integral to its platform and central to Lyft's contracts with drivers, balancing Lyft's commitments to rider and public safety, and driver access to the platform. Four key provisions in the Challenged Law substantially impair Lyft's existing contracts by rewriting the Deactivation Terms:

a.     The Deactivation Prohibitions substantially impair Lyft's existing contracts by replacing the Deactivation Terms with the City's constricted "just cause" standard and notice requirements that will compromise Lyft's ability to prioritize the safety of riders and the public.

b.     The Retroactive Provision, which applies the Deactivation Prohibitions retroactively, thus impairs Lyft's contracts for the same reasons. The Retroactive Provision compounds this violation by rewriting the Deactivation Terms of thousands of contracts over the past seven years.

c.     The Fact-Finding Provisions impair Lyft's contracts by rewriting the appeal process to allow drivers to challenge deactivations before multiple fact-finders and under unfair procedural and evidentiary rules.

d.     The Compelled Reports Provision imposes disclosure requirements not present in Lyft's current contracts. Lyft's reasonable expectation upon entering these contracts was that it would not be forced to disclose sensitive and proprietary information to drivers.

75.     The Deactivation Prohibitions, Retroactive Provision, Fact-Finding Provisions, and Compelled Reports Provision do not advance any significant or legitimate public purpose. Rather,

the Challenged Law as a whole, and each of these parts independently, are intended to favor deactivated drivers at the expense of the safety of riders and the public.

## COUNT II: Due Process Violation

**(Declaratory and Injunctive Relief for Violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution, as to the Retroactive Provision)**

76.     Lyft realleges and incorporates herein by reference all paragraphs above.

77.     The Due Process Clause of the Fourteenth Amendment "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). "Retroactivity concerns are further heightened" where a law "affect[s] contractual or property rights, matters in which predictability and stability are of prime importance." *Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 154 N.E.3d 972, 1000 (N.Y. 2020) (citing *Landgraf*, 511 U.S. at 271).

78.     The Retroactive Provision violates the Due Process Clause of the Fourteenth Amendment because it imposes an irrational and arbitrary seven-year lookback period without any rationale, let alone a persuasive one, for either the retroactive application generally or the seven-year period in particular. Neither the Challenged Law itself nor its legislative history supports a clear purpose for its retroactive application.

79.     The Retroactive Provision violates the Due Process Clause also because it imposes severe consequences on Lyft. Lyft will have to shoulder immense costs and resources to reinvestigate and re-adjudicate years'-old deactivation decisions and justify them against a "just cause" standard that did not then exist. In this way, the Retroactive Provision will disrupt seven years of settled transactions between Lyft and drivers, which were governed by the agreed-upon terms in their Agreement.

80.     For substantially similar reasons, the Challenged Law violates Article I, Section 6

24

of the New York Constitution. *See Regina Metro. Co.*, 154 N.E.3d at 988 (legislative purpose must provide "a 'persuasive reason' for the 'potentially harsh' impacts of retroactivity").

### COUNT III: Compelled Speech

**(Declaratory and Injunctive Relief for Violation of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 8 of the New York Constitution, as to the Compelled Reports Provision)**

81.     Lyft realleges and incorporates herein by reference all paragraphs above.

82.     The First Amendment to the U.S. Constitution protects the right to free speech, including the rights to not speak and to not express views with which a person disagrees. The First Amendment forbids the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). For this reason, the government cannot "compel a person to speak its own preferred messages," as this "alter[s] the expressive content" of their speech. *303 Creative LLC v. Elenis*, 600 U.S. 570, 585-86 (2023).

83.     The Compelled Reports Provision violates the First Amendment because it is content-based, forcing Lyft to take a position and express views on privacy, safety, and discipline that may be contrary to its own. The Compelled Reports are thus presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 166 (2015).

84.     The Compelled Reports Provision fails strict scrutiny because the government cannot prove they are "narrowly tailored to serve compelling state interests," *Id*. at 171, or "the least restrictive means to achieve its ends" *CompassCare v. Hochul*, 125 F.4th 49, 63 (2d Cir. 2025) (citation omitted). The Challenged Law aims to address an unfounded problem for the benefit of deactivated drivers at the expense of riders and the general public. This is not a legitimate state interest, let alone a compelling one. Nor are any of these provisions narrowly tailored to serve even that interest, given the overbreadth of the disclosure requirements.

85.     Even if this provision compels Lyft "to engage in purely commercial speech," it would fail intermediate scrutiny. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996). Intermediate scrutiny requires that the government establish that the interest served by the law is substantial, that the law directly advances the asserted interest, and that the interest could not be served as well by a more limited regulation of speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). Here, the City cannot establish any substantial interest in protecting drivers at the expense of Lyft, riders, and the public.

86.     Because the Compelled Reports Provision does not compel the disclosure of purely factual information about Lyft's "own products or services," the standard from *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) does not apply. *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264 (2d Cir. 2014). Even if *Zauderer* did apply, the Provision would still be unconstitutional because these disclosure provisions are "unjustified," "unduly burdensome," and not "reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.

87.     For substantially similar reasons, the Compelled Reports Provision violates Article I, Section 8 of the New York Constitution.

### COUNT IV: Expressive Association

**(Declaratory and Injunctive Relief for Violation of Expressive Association under the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 8 of the New York Constitution, as to the Retroactive Provision)**

88.     Lyft realleges and incorporates herein by reference all paragraphs above.

89.     The First Amendment protects the freedom of "expressive association"—that is, the right to "associate" with others "for the purpose of speaking." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006).

90.     Strict scrutiny is required where the burden on expressive association is "severe"

rather than merely "incidental," such as when an organization is "force[d]" to retain personnel "who act or have acted against the very mission of its organization." *Slattery v. Hochul*, 61 F.4th 278, 287-88 (2d Cir. 2023).

91.     Lyft engages in protected expressive association through its company values and policies. The Retroactive Provision significantly affects Lyft's expression by forcing it to continue to engage with drivers from whom Lyft has already chosen to disassociate for engaging in conduct contrary to its contracts, values, and policies.

92.     The City's interest does not outweigh this burden. The Challenged Law aims to address an imaginary problem for the benefit of drivers at the expense of riders and the general public. This is not a legitimate state interest, let alone a compelling one. Nor is the Challenged Law narrowly tailored to serve that interest, given the lack of any rationale behind the seven-year retroactivity period.

93.     For substantially similar reasons, the Retroactive Provision violates Article I, Section 8 of the New York Constitution.

### COUNT V: Due Process Violation (Void-For-Vagueness)

**(Declaratory and Injunctive Relief for Violation of the Due Process Clause (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution, as to the Challenged Law)**

94.     Lyft realleges and incorporates herein by reference all paragraphs above.

95.     The Due Process Clause requires that governments provide "fair notice of what conduct is prohibited." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (citation omitted). "As one of the 'most fundamental protections of the Due Process Clause,' the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them." *Thibodeau v. Portuondo*,

27

486 F.3d 61, 65 (2d Cir. 2007) (citations omitted).

96.     The Challenged Law is replete with provisions that are so vague as to not provide constitutionally sufficient notice. The Deactivation Prohibitions provide or reference no clarifying definition of "just cause" or "progressive discipline" that shows Lyft what is required under those provisions. In addition, the required notices for deactivations must include "precise and detailed" justifications, but do not define what that means. Lyft faces serious risks of different fact-finders interpreting "precise and detailed" in different ways, leading to arbitrary and unpredictable results that cloud, rather than clarify, the standard.

97.     The Fact-Finding Provisions require that Lyft's compliance with the "just cause" standard be measured against factors incorporating further ambiguous terms, including whether the driver violated a policy that was "reasonably related to safe and efficient" operations, whether deactivation was a "reasonable response," and whether a "progressive discipline" was utilized.[74]

98.     For substantially similar reasons, the Challenged Law violates Article I, Section 6 of the New York Constitution.

### COUNT VI: Equal Protection Violation

**(Declaratory and Injunctive Relief for Violation of the Equal Protection Clause (42 U.S.C. § 1983) and Article I, Section 11 of the New York Constitution, as to the Challenged Law)**

99.     Lyft realleges and incorporates herein by reference all paragraphs above.

100.    The Challenged Law violates the Equal Protection Clause of the Fourteenth Amendment, which requires that the reason for treating two groups differently be rationally related to a legitimate government interest.

101.    The Challenged Law imposes an irrational and arbitrary restraint on Lyft's ability to maintain standards on its platform and instead provides preferential treatment to drivers. That

---

[74]    Local Law 52 of New York City of 2026 § 20-1282(b).

28

preferential treatment comes at the direct expense of Lyft and Uber (the only two companies named as targets of the Challenged Law), and to the detriment of both riders and public safety, which is not a reasonable and nondiscriminatory legislative purpose.

102.    Lyft and Uber are similarly situated to other businesses operating in the City. The Law nonetheless restrains the ability of one class (Lyft and Uber) to deactivate drivers to maintain standards and safety, including restraining the ability to freely contract with drivers, while it does not do so for any other similarly situated business.

103.    The City has not provided any (let alone a rational) basis for this distinction.

104.    For substantially similar reasons, the Challenged Law violates Article I, Section 11 of the New York Constitution.

**COUNT VII: Procedural Due Process Violation**

**(Declaratory and Injunctive Relief for Violation of Procedural Due Process under the Fourteenth Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 6 of the New York Constitution, as to the Fact-Finding Provisions)**

105.    Lyft realleges and incorporates herein by reference all paragraphs above.

106.    Under the Fourteenth Amendment, the state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

107.    The Fact-Finding Provisions violate the Fourteenth Amendment because they deprive Lyft of its protected interests without due process of law.

108.    Lyft has a protected interest in safeguarding who can have access to its proprietary platform. The Fact-Finding Provisions deprive Lyft of that interest without affording Lyft due process. Under these Provisions, Lyft must prove by a preponderance of the evidence that it had "just cause" to deactivate a driver. While drivers are free to submit any and all exculpatory evidence, Lyft will be restricted to evidence expressly included in deactivation notices. By shifting

29

the burden of proof to Lyft while simultaneously preventing Lyft from mounting a complete defense, the Fact-Finding Provisions create a presumption that the deactivation decision was unlawful.

109. Under the Challenged Law, Lyft will be forced to reactivate drivers that were fairly and justifiably deactivated from the platform. This creates a substantial risk that Lyft's interests in controlling access to its platform will be erroneously deprived.

## **PRAYER FOR RELIEF**

WHEREFORE, Lyft respectfully requests that the Court:

(a) Declare that the Challenged Law violates provisions of the United States Constitution and the New York Constitution, is invalid, and is unenforceable against Plaintiff;

(b) Declare that each of the following provisions of the Challenged Law violate the United States Constitution and the New York Constitution, are invalid, and are unenforceable against Plaintiff:

    a. Deactivation Prohibitions (§ 20-1282(a)-(e));

    b. Retroactive Provision (§ 20-1283(a)-(b));

    c. Fact-Finding Provisions (§§ 20-1285, 20-1211(c), and 20-1208(c)(1)); and

    d. Compelled Reports Provision (§ 20-1286).

(c) Enter a preliminary and permanent injunction (1) enjoining the City and each of the City's officers, agents, servants, employees, and attorneys, and any other person or entity subject to its control, acting on its behalf, or acting directly or indirectly in concert or participation with it from taking any steps to (a) implement any provision of the Challenged Law against Plaintiff or its affiliated entities, or (b) enforce or apply, retroactively or prospectively, to or as against

Plaintiff, any provision of the Challenged Law; and (2) staying, enjoining, and restraining the effective date of the Challenged Law as to Plaintiff;

(d)     Award fees, costs, expenses, and disbursements, including attorneys' fees to which Plaintiff is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

(e)     Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 10, 2026

                                            */s/ Alexander C. Drylewski*
                                            Alexander C. Drylewski
                                            Jacob G. Lefkowitz
                                            SKADDEN, ARPS, SLATE,
                                              MEAGHER & FLOM LLP
                                              One Manhattan West
                                            New York, NY 10001
                                            Telephone: (212) 735-3000
                                            Alexander.Drylewski@skadden.com
                                            Jacob.Lefkowitz@skadden.com

                                            *Counsel for Plaintiff Lyft, Inc.*