UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYFT, INC.,

            *Plaintiff*,

      v.

THE CITY OF NEW YORK,

            *Defendant*.

Case No. 1:26-cv-04931

**<u>ORAL ARGUMENT</u>**
**<u>REQUESTED</u>**

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000

*Counsel for Plaintiff Lyft, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................................iii

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ...........................................................................................................................3

        A.      Lyft, Drivers, and Riders Freely Enter Into Mutually Beneficial
              Agreements With Balanced Deactivation Terms ........................................................3

        B.      The City Council Enacts the Challenged Law Aiming to Create A
              Presumption That All Deactivations Are Unlawful .................................................5

        C.      The Challenged Law Rewrites Lyft's Contracts to the Detriment of Safety ...........6

LEGAL STANDARD.....................................................................................................................7

ARGUMENT .................................................................................................................................8

I.       LYFT IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS.............................8

        A.      The Challenged Law Violates the Contract Clause ....................................................8

             1.      The Challenged Law substantially impairs Lyft's contracts.........................9

             2.      The Challenged Law does not serve a legitimate public purpose ..............12

             3.      The Challenged Law is not a reasonable and appropriate means to
                   prevent "wrongful deactivations"................................................................14

        B.      The Retroactive Provision Violates Due Process .....................................................16

II.     LYFT WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION ....................18

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN
       INJUNCTION ......................................................................................................................20

CONCLUSION.............................................................................................................................21

## TABLE OF AUTHORITIES

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019) ................................................................8, 20

*A.H. by & through Hester v. French*,
  985 F.3d 165 (2d Cir. 2021).......................................................................20

*Airbnb, Inc. v. City of New York*,
  373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...............................................................20

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)...............................................................................8, 12

*AmerisourceBergen Drug Corp. v. New York State Department of Health*,
  227 A.D.3d 1286 (N.Y. App. Div. 2024), *appeal dismissed*, 42 N.Y.3d 1023
  (2024)...........................................................................................17

*Association of Equipment Manufacturers v. Burgum*,
  932 F.3d 727 (8th Cir. 2019)........................................................................13

*Brenntag International Chemicals, Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999)........................................................................18

*Buffalo Teachers Federation v. Tobe*,
  464 F.3d 362 (2d Cir. 2006)........................................................................12

*Can't Live Without It, LLC v. ETS Express, Inc.*,
  No. 17-CV-3506 (JSR), 2017 WL 4776741 (S.D.N.Y. Oct. 10, 2017)..............................19

*Donohue v. Mangano*,
  886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...............................................................12

*DoorDash, Inc. v. City of New York*,
  692 F. Supp. 3d 268 (S.D.N.Y. 2023) ..........................................2, 9, 11, 13, 15

*Eastern Enterprises v. Apfel*,
  524 U.S. 498 (1998)..............................................................................16, 18

*James Square Associates LP v. Mullen*,
  21 N.Y.3d 233 (2013)...............................................................................17

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996).........................................................................19

*Landgraf v. USA Film Products*,
  511 U.S. 244 (1994)..............................................................................16, 17

iii

*Ligon v. City of New York*,
    925 F. Supp. 2d 478 (S.D.N.Y. 2013) .................................................................................20

*Melendez v. City of New York*,
    16 F.4th 992 (2d Cir. 2021)............................................................................ 9, 11, 12, 14, 15

*Mercado v. Noem*,
    800 F. Supp. 3d 526 (S.D.N.Y. 2025), *appeal dismissed*, No. 25-2922, 2026 WL
    1382401 (2d Cir. Mar. 3, 2026) ........................................................................................20

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984)........................................................................................19, 20

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010).................................................................................................19

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984)...........................................................................................................16

*Regina Metropolitan Co. v. New York State Division of House & Community Renewal*,
    35 N.Y.3d 332 (2020)............................................................................................ 16, 17, 18

*Sanitation & Recycling Industry, Inc. v. City of New York*,
    107 F.3d 985 (2d Cir. 1997)..............................................................................................14

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001).............................................................................................19

*Sullivan v. Nassau County Interim Finance Authority*,
    959 F.3d 54 (2d Cir. 2020)................................................................................................11

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................................7, 18

*In re Workers' Compensation Refund*,
    46 F.3d 813 (8th Cir. 1995)...............................................................................................11

## PRELIMINARY STATEMENT

Lyft, Inc. ("Lyft") operates transportation networks in the United States and internationally that offer access to transportation options through the Company's platform and mobile-based application (the "Lyft platform"). For years, Lyft, riders, and drivers have entered into contracts to govern the terms of their relationship, and relied on these contracts to keep Lyft operating, prioritize the safety of people who use the Lyft platform and the public, and keep drivers earning with Lyft. At the center of the relationship between Lyft, riders, and drivers are the terms that govern driver and rider access to, and removal from, the platform. Under these terms, Lyft retains the right to deactivate drivers immediately for safety-related misconduct, while drivers retain the right to appeal deactivations they believe are not fair or justified.

In 2026, New York City (the "City") enacted Local Law 52 (the "Challenged Law"), which rewrites and interferes with these balanced and considered deactivation terms. The Challenged Law replaces Lyft's enumerated grounds for deactivation with an unduly restrictive "just cause" standard, requires 14 days' notice before many deactivations (even those that could involve dangerous behavior or circumstances), and creates a new private cause of action for drivers that goes well beyond their contractual or legal rights. Worse still, the Challenged Law applies these new restrictions retroactively to 2019, permitting any driver deactivated over the past seven years to seek reinstatement and damages under standards that did not exist at the time of deactivation and for reasons that directly contradict the agreements between Lyft, riders, and drivers. The Challenged Law thus disrupts years of settled expectations for all users and upends Lyft's efforts to prioritize platform safety, and fairness and transparency towards drivers. It should be declared invalid and its enforcement enjoined as unconstitutional under the United States and New York Constitutions.

1

Lyft seeks a preliminary injunction enjoining the City from enforcing the Challenged Law, which is set to take effect on July 28, 2026. Such relief is warranted for the following reasons:

*First*, Lyft is likely to prevail on the merits of its claims, including that the Challenged Law violates the Contract Clause and the retroactive application of the Challenged Law violates the Due Process Clause of the United States Constitution. The Challenged Law violates the Contract Clause because it rewrites terms "central" to the contract between Lyft, riders, and drivers, and unduly and permanently destroys Lyft's contractual rights in the process. *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 289-91 (S.D.N.Y. 2023) (Woods, J.). The Challenged Law's retroactivity provision independently violates the Due Process Clause because the City does not offer any rational justification for imposing new liability reaching seven years into the past, upending thousands of settled deactivation decisions Lyft made in reliance on its existing contracts with riders and drivers.

*Second*, in the absence of injunctive relief, Lyft will suffer irreparable harm from the violation of its constitutional rights, the direct subversion of its safety efforts, and the resulting damage to its reputation and goodwill. These harms cannot be compensated by money damages, even if the Law is later declared unconstitutional.

*Finally*, the balance of equities and public interest overwhelmingly favor an injunction. The City has no interest in enforcing an unconstitutional law—particularly one that threatens to undermine public safety with no legitimate justification.

For these reasons, Lyft requests that the Court enter a preliminary injunction enjoining the Challenged Law and staying its effective date while this important challenge proceeds.

## BACKGROUND[1]

**A.      Lyft, Drivers, and Riders Freely Enter Into Mutually Beneficial Agreements With Balanced Deactivation Terms**

Lyft is a high-volume for-hire vehicle service ("HVFHVS") that connects riders with drivers through its mobile application. Safety is one of Lyft's highest priorities. (Ex. A.) To that end, Lyft monitors rides for certain unusual activity and checks in with riders and drivers in those circumstances, and safety teams are available to assist by phone or chat 24/7. (Ex. A; Ex. B.) Lyft holds drivers and riders alike accountable for safety; through its "Community Guidelines," Lyft asks all users to "put safety first" and hold themselves "accountable to everyone in the car." (Ex. D.)

Lyft's relationship with drivers and riders is governed by contract. Each driver voluntarily chooses to enter the relationship by agreeing to the "Terms of Service" (Ex. 2) that, together with incorporated guidelines, policies, and addenda (the "Agreement"), establish the terms governing the relationship. (Castleman Decl. ¶ 7.) The "Deactivation Terms," which are codified in Section 16 (and incorporate Sections 9 and 10) of the Agreement (Ex. 2), are integral both to the success of the platform for all users and Lyft's commitments to safety. (Castleman Decl. ¶ 8; Complaint (ECF No. 1) ("Compl.") ¶ 18.)

Under the Deactivation Terms, Lyft may deactivate a driver, after notice and an opportunity to cure, if: (1) the driver ceases to qualify as a user, (2) the driver ceases to qualify under applicable law, (3) the driver falls below Lyft's star rating threshold, or (4) Lyft has a good-faith belief that deactivation is necessary to protect safety. (Castleman Decl. ¶ 9; Ex. 2 § 16 Term and Termination.)

---

[1]    Exhibits 1-9 are attached to the accompanying Declaration of Alexander C. Drylewski. Exhibits A-G are attached to the accompanying Declaration of Luke Castleman ("Castleman Decl.").

If the driver cures the deficiency, Lyft will not permanently deactivate the driver. (Castleman Decl. ¶¶ 9, 19; Ex. 2 § 16 Term and Termination.)

Drivers and Lyft agree that Lyft may deactivate drivers immediately and without notice for violations of Sections 9 and 10(a)-(i) of the Agreement. (Castleman Decl. ¶ 10; Ex. 2.) Section 9 prohibits "restricted activities," including stalking, harassment, discrimination, sexual assault, fraud, and conduct undermining the platform. (Castleman Decl. ¶ 11; Ex. 2 § 9 Restricted Activities.) Section 10 requires drivers to represent that they are competent, licensed, and insured, and prohibits defrauding Lyft or riders. (Castleman Decl. ¶ 12; Ex. 2 § 10 Driver Representations, Warranties and Agreements.) Under the Agreement, material breaches of these provisions warrant immediate deactivation. (Castleman Decl. ¶ 10; Ex. 2 § 16 Term and Termination.)

For potential violations relating to safety incidents, Lyft follows an investigation and deactivation process. If Lyft determines it is warranted to protect the safety of the platform, the driver's account is placed on a temporary hold while Lyft investigates, during which time both the rider and driver may submit evidence. (Castleman Decl. ¶¶ 13-14; Compl. ¶ 22.) Lyft notifies the driver of the hold and requests relevant information to aid Lyft's investigation. (Castleman Decl. ¶ 13; Compl. ¶ 22.) The driver is unable to accept new trip requests during this hold period. (Castleman Decl. ¶ 13; Compl. ¶ 22.) The driver and rider may also speak directly with the investigating agent by telephone to provide their account of the events and ask questions about the process. (Castleman Decl. ¶ 14; Compl. ¶ 22.)

Once the investigation is complete, Lyft notifies the driver of the final decision—either that the allegations have not been substantiated and no action is warranted, the allegations warrant a warning on the driver's account, or that the driver's account has been permanently deactivated. (Castleman Decl. ¶ 14; Ex. G.) If permanently deactivated, the driver may appeal to Lyft safety

4

agents who were not involved in the underlying investigation and deactivation, and submit additional information or newly available information such as dash cam footage, photos, videos, and police reports. (Castleman Decl. ¶ 15; Ex. G.) Those safety agents review the appeal to determine whether to uphold or overturn the permanent deactivation. (Castleman Decl. ¶ 15; Ex. G.) Under this framework, over 70% of driver account holds are resolved within 24 hours. (Castleman Decl. ¶ 17; Ex. 3 at 56.)

The Deactivation Terms thus embody Lyft's careful balancing of platform and public safety with driver access. Under these terms, Lyft is able to intervene swiftly to deactivate drivers who pose a risk to public and rider safety, and drivers are afforded notice, an opportunity to submit information, and a process to appeal deactivations that they believe are not fair or justified. (Castleman Decl. ¶¶ 17-19; Compl. ¶ 28.) As Lyft has explained, "[b]alancing the safety of all riders using the Lyft platform while allowing drivers to continue contributing to Lyft's community and earning money is fundamental to [Lyft's] business." (Compl. ¶ 29.)

**B.    The City Council Enacts the Challenged Law Aiming to Create A Presumption That All Deactivations Are Unlawful**

In February 2024, City Council Member Krishnan introduced Intro 0276-2024 (the "Bill"), which would later become the Challenged Law. (Compl. ¶ 31.) The Bill was drafted at the urging of the New York Taxi Workers Alliance ("NYTWA"), which has lobbied for years against Uber and Lyft, as well as their deactivation policies, claiming without basis that drivers were being "fired with no just cause or way to appeal." (Compl. ¶¶ 30-31.) In fact, public reports credit the NYTWA with "draft[ing] and inspiring" the Bill. (*Id.*) Mr. Krishnan conceded that the Bill targeted Uber and Lyft specifically, and NYTWA's Executive Director acknowledged its goal was to presume that all deactivations were unlawful and require the companies to prove otherwise. (Ex. 5 at 21:11-13; 22:7-14; 24:5-9; 53:21-54:2.)

The City Council never considered actual data about "unfair deactivations"; indeed, its evidentiary basis consisted only of anecdotes from a handful of drivers. (Compl. ¶ 34; Ex. 5.) Lyft opposed the Bill—not because it disagreed with fair deactivation policies, but because the Bill threatened to jeopardize rider and public safety while failing to take into account Lyft's existing processes. (Ex. 3 at 55-56; Ex. 4.) Lyft warned that the Bill would prevent it "from promptly removing drivers who have been reported as engaging in unsafe conduct" and would endanger riders by requiring witnesses to relive their difficult experiences. (Ex. 4.)

The Council did not address these safety concerns, or even mention safety as a consideration in developing and enacting the Bill. Moreover, proposals intended to promote safety were rejected. Those proposals included: (i) broadening the definition of "egregious misconduct" to encompass all "conduct that endangers others," which was rejected as purportedly "over-inclusive" even though it would include unsafe or reckless driving, and (ii) allowing companies' "reasonable belief of misconduct" to justify deactivations. (Ex. 6 at 12-13, 15.) On December 18, 2025, the Council passed an amended version of the Bill, which then-Mayor Eric Adams vetoed on December 31, 2025. (Ex. 7.) On January 29, 2026, the Council enacted the Bill into law, overriding Mayor Adams' veto. (Compl. ¶ 42.) The Challenged Law is set to take effect on July 28, 2026, subject to rulemaking. (Compl. ¶ 42.)

**C.      The Challenged Law Rewrites Lyft's Contracts to the Detriment of Safety**

The Challenged Law consists of four groups of related provisions that sweep aside and replace the Deactivation Terms in Lyft's existing contracts.

First, Sections 20-1282(a)-(e) (the "Deactivation Prohibitions") prohibit Lyft from deactivating drivers unless the deactivation falls within three narrowly-drawn grounds; set new standards for fact-finders to determine whether Lyft had "just cause" to deactivate drivers; and require Lyft to notify offending drivers at least 14 days in advance of an impending deactivation

in many instances. (Ex. 1 § 20-1282(a)-(e).)

Second, Section 20-1283(a)-(b) (the "Retroactive Provision") applies the Deactivation Prohibitions retroactively back to 2019, and permits any driver deactivated over the past seven years to petition Lyft for reinstatement. (Ex. 1 § 20-1283(a)-(b).) Lyft must then prove that its prior decision meets the newly imposed, narrow grounds for deactivation that did not exist at the time of the deactivation and were only established in the Deactivation Prohibitions. (*Id.*) Under this unworkable standard, Lyft will be forced to reactivate drivers that it had justifiably removed from the platform in accordance with the Agreement. (Compl. ¶ 60.)

Third, Sections 20-1285(a)-(c), 20-1211(c), and 20-1208(c)(1) (the "Fact-Finding Provisions") grant drivers a private right of action to challenge their deactivations (past and present) and seek a range of remedies, including reinstatement, costs, punitive damages, back pay, and civil penalties. (Ex. 1 §§ 20-1285(a)-(c), 20-1211(c), 20-1208(c)(1).) In these proceedings, Lyft will bear the burden of proving that the deactivation complied with the Deactivation Prohibitions under rules that create a presumption of reinstatement. (Ex. 1 § 20-1285(a)-(b).)

Finally, Section 20-1286 (the "Compelled Reports Provision") requires Lyft to provide "information and data" to drivers deactivated for "egregious misconduct" or whose prior deactivation has been upheld, including "driver performance data," "customer comments, ratings, and complaints," and "reports" regarding the discipline of other drivers who engaged "in the same or similar misconduct." (Ex. 1 § 20-1286.)

## LEGAL STANDARD

A preliminary injunction is warranted where the movant demonstrates (i) a probability of success on the merits, (ii) a danger of irreparable harm without an injunction, (iii) that the balance of equities tips in its favor, and (iv) that an injunction will serve the public interest. *See Winter v.*

7

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the defendant, the "balance of hardships" and "public interest" factors "merge." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019). As demonstrated below, each factor weighs in favor of granting a preliminary injunction.

## ARGUMENT

Lyft is entitled to an injunction preliminarily enjoining enforcement of the Challenged Law. Lyft is likely to succeed on the merits of its claims because, among other things, the Challenged Law upends the contracting parties' settled contractual expectations and arbitrarily imposes retroactive liability without a legitimate justification. Lyft will suffer irreparable harm in the absence of relief, both from the impending violation of its constitutional rights as well as damage to its business and reputation. And the balance of equities and public interest favor the suspension of an unconstitutional law that threatens to jeopardize the safety of riders and the public.

## I.     LYFT IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS[2]

### A.     The Challenged Law Violates the Contract Clause

The Challenged Law unconstitutionally impairs Lyft's existing and prior contracts with drivers because it rewrites central terms of the parties' Agreement to make driver deactivations presumptively unlawful at the expense of public and rider safety. The Contract Clause limits the power of a state or local government to "abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438

---

[2] To obtain a preliminary injunction, Lyft "need only show a likelihood of success on the merits of at least one of [its] claims." *725 Eatery Corp.*, 408 F. Supp. 3d at 459. In addition to the bases addressed herein, the Challenged Law's impermissible vagueness, violation of the Equal Protection Clause, violation of the First Amendment, and unfair procedure under the Due Process Clause (Counts III-VII) also are likely to succeed. Lyft adopts and incorporates by reference the arguments made in Uber Technologies, Inc.'s Memorandum of Law in Support of its Motion for Preliminary Injunction. *Uber Technologies et al v. City of New York*, 1:26-cv-0489, ECF No. 6 (S.D.N.Y. June 9, 2026).

U.S. 234, 242 (1978). These protections flow from the "high value the Framers placed on . . . private contracts," which "enable individuals to order their personal and business affairs according to their particular needs and interests." *Id.* at 245. "Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.*

In determining whether a state or local law violates the Contract Clause, courts consider (i) whether the contractual impairment is "substantial," (ii) whether the law serves a "significant and legitimate public purpose," and (iii) whether the means chosen to accomplish that purpose are "reasonable and necessary." *Melendez v. City of New York*, 16 F.4th 992, 1031-48 (2d Cir. 2021). Here, the Challenged Law substantially impairs Lyft's contracts because it negates and distorts deactivation terms that are central to those contracts. The City cannot justify this substantial impairment because the "unfair deactivation" crisis it has invoked is unfounded and the City's stated goal—to make driver deactivations presumptively unlawful at the expense of rider and public safety—is not a legitimate public purpose.

1.      *The Challenged Law substantially impairs Lyft's contracts*

A law "substantially impairs" a contract when it "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1033 (quoting *Sveen v. Melin*, 584 U.S. 811, 819 (2018)). For example, in *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 289-91 (S.D.N.Y. 2023), this Court concluded that a City regulation imposing caps on food delivery commissions substantially impaired contracts between food delivery platforms and restaurants. The regulation "undermined the contractual bargain" because it rewrote payment terms central to the parties' agreement. *Id.* at 290. It interfered with the platforms' "reasonable expectations" because a price-setting regulation was not foreseeable in the industry. *Id.* And it prevented platforms from reinstating rights because

9

the regulation was permanent. *Id.* This same reasoning applies squarely to the Challenged Law and supports issuance of a preliminary injunction.

First, the Challenged Law "undermines the contractual bargain" because it rewrites the Deactivation Terms that are central to Lyft's contracts. These terms specify the grounds and procedures for deactivation, carefully balancing rider and public safety, and driver access to the platform. Under these terms, Lyft may immediately deactivate drivers who engage in defined restricted activities that threaten rider or public safety or whose conduct undermines the operability of the platform. Drivers, in turn, may appeal deactivations to safety agents. For years, Lyft, drivers, and riders have relied on these terms to keep Lyft operating, to prioritize the safety of people who use the Lyft platform and public safety, and to keep drivers earning with Lyft.

The Challenged Law dismantles this balanced framework by replacing Lyft's enumerated grounds for deactivation with a new and restrictive "just cause" standard that recognizes only three categories of misconduct—two of which require Lyft to issue "progressive discipline" before it may deactivate a driver. *See* N.Y.C. Admin. Code § 20-1282(a).[3] The third category of misconduct—"egregious misconduct"—does not require "progressive discipline," but is defined narrowly and vaguely to include only (i) illegal discrimination or (ii) "conduct that poses an imminent danger to other persons." *Id.* § 20-1281. Together, these restrictions will prevent Lyft from deactivating drivers who have materially violated their contracts, either because those drivers were not first subject to "progressive discipline" or because their misconduct, even if extremely serious, falls short of posing "imminent danger" under the new standards.

---

[3]    Notably, when using "progressive discipline," the Challenged Law prohibits Lyft from considering driver conduct "more than 1 year before" the conduct at issue. *Id*. § 20-1282(c).

The Deactivation Prohibitions compound this harm by requiring Lyft to notify an offending driver at least 14 days before any deactivation, unless the underlying misconduct qualifies as sufficiently "egregious." *Id.* § 20-1282(d). This means that Lyft will be forced to keep drivers on the platform and eligible for performing rides even where their misconduct implicates safety concerns but falls short of the new "imminent danger" standard. Collectively, these Deactivation Prohibitions do not merely revise the terms of the existing deactivation framework: they fundamentally rewrite it. And in doing so, they compromise Lyft's ability to keep the platform operational for all users.

Second, the Challenged Law interferes with the contracting parties' "reasonable expectations" that Lyft could control access to its platform through transparent and contracted-for deactivation procedures. "[T]he reasonableness of expectations depends, in part, on whether the legislative action was foreseeable, and this, in turn, is affected by whether the relevant party operates in a heavily regulated industry." *Sullivan v. Nassau Cnty. Interim Fin. Auth*., 959 F.3d 54, 64 (2d Cir. 2020). While the HVFHVS industry is subject to certain regulations, none has ever pertained to deactivation procedures "so as to alert New York [HVFHVS] . . . to the possibility of state action in that regard." *Melendez*, 16 F.4th at 1034. That is why the Bill's legislators and advocates trumpeted its groundbreaking nature, testifying that it was "starting a nationwide movement" (Ex. 8 at 6:7-10) and representing the "first time that drivers will have rights codified in the law" relating to deactivation standards (Ex. 5 at 52:6-7). *DoorDash*, 692 F. Supp. 3d at 290 (price control legislation unforeseeable in part because it was "the first of its kind in the nation").

Lyft never expected that the City would rewrite provisions in the contracts affecting something as fundamental as Lyft's ability to determine who can access its platform. Indeed, the Deactivation Terms have governed the parties' relationship for years and Lyft had no reason to

11

assume that the City would attempt to supplant those terms, let alone do so retroactively for an arbitrary, seven-year period. *See In re Workers' Comp. Refund*, 46 F.3d 813, 818-19 (8th Cir. 1995) (expectations may be particularly disrupted where legislation applies retroactively, since it is reasonable to expect "settled plans or arrangements" to remain settled). By permanently and unexpectedly supplanting the Deactivation Terms, the Challenged Law has interfered with the parties' settled contractual expectations and thus is invalid. *See Donohue v. Mangano*, 886 F. Supp. 2d 126, 157 (E.D.N.Y. 2012) (county law "resulting in a monumental shift between the two players at the bargaining table" was not foreseeable).

Third, because the Challenged Law is permanent, it prevents Lyft from "safeguarding or reinstating" its rights. In *Melendez*, 16 F.4th at 1033, the Second Circuit emphasized the permanent effect of a City law suspending personal guarantees in commercial lease agreements. While the law applied only to a sixteen-month period, its "permanent and irrevocable repudiation of guaranty obligations seriously upsets landlords' reasonable expectations." *Id.* at 1034. The Challenged Law here is permanent *and retroactive*, meaning it not only bars Lyft from invoking deactivation rights in the future, but it also nullifies Lyft's exercise of those contracted-for rights in the past. If a law that "permanently and entirely extinguishes" contract rights "demonstrates a significant impairment of contract," *Melendez*, 16 F.4th at 1039, one that also works in reverse to unwind rights in then-existing contracts is uniquely destructive.

### 2. *The Challenged Law does not serve a legitimate public purpose*

Because the Challenged Law "substantially impairs" Lyft's contracts, the City must show "a significant and legitimate public purpose behind the law." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006). A legitimate public purpose is one "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Id*. The City's burden to show this purpose is "more demanding than [the] rational basis review" and

heavier still when the impairment is "severe," requiring a "careful examination of the nature and purpose" of the challenged legislation. *Melendez*, 16 F.4th at 1032, 1035; *see also Allied Structural Steel*, 438 U.S. at 248 ("The severity of the impairment measures the height of the hurdle the state legislation must clear.").

The City cannot meet this standard. The Challenged Law does not "deal with a broad, generalized economic or social problem" but rather aims to benefit only "a narrow class." *Allied Structural Steel*, 438 U.S. at 248-50; *see also DoorDash*, 692 F. Supp. 3d at 289. Even on a cursory examination, the nature and purpose of the Challenged Law is narrow, seeking only to address "the wrongful deactivation of high-volume for-hire vehicle drivers." (Ex. 1 Preamble.) The Challenged Law does not even "purport[] . . . to deal with a broad, generalized economic or social problem," making no reference to a conceivable public purpose or even incidental benefits to the public. *Allied Structural Steel*, 438 U.S. at 248-50. As the plain text and legislative record confirm, the Law's focus is protecting and benefiting the interests of HVFHVS drivers and previously deactivated HVFHVS drivers. *See Ass'n of Equip. Mfrs. ("AEM") v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019) (affirming preliminary injunction of retroactive law that "nowhere mention[ed]" a broad societal interest, "ha[d] a narrow focus," and "primarily benefit[ed] a particular economic actor in the farm economy").

A more searching and "careful examination" of the legislative record reveals even more problems with the goals animating the Challenged Law. While legislators justified the law as necessary to address "wrongful deactivations," they cited no data or evidence that such a problem even existed, relying instead on anecdotes from a handful of drivers that their deactivations were unfair. Thus, even assuming "wrongful deactivations" count as a "broad, generalized [] social problem," the Council failed to establish in the legislative record that it was ever a problem in the

13

first place. *See AEM*, 932 F.3d at 732 (public purpose must be supported by "legislative findings, supported by an adequate factual basis, that documented the existence of an economic emergency," rather than "[m]ere assertions of a conceivable public purpose"). Indeed, as in *Melendez* and *DoorDash*, the legislative history here indicates "certain hostility" to Plaintiff, with legislators identifying Lyft and Uber by name and vilifying them as callous "megacorporations." (Ex. 8 at 6:13-15; *see* Ex. 9.) Together with the absence of any objective evidence of "unfair deactivations," these statements reveal that the law aimed to not only benefit drivers, but to do so specifically at Lyft's and Uber's expense. *See Melendez*, 16 F.4th at 1037 (statements indicating "a certain hostility to landlords and sympathy for small business owners" suggested the law might "not protect a basic societal interest, but benefit[] only a favored group").

### 3. The Challenged Law is not a reasonable and appropriate means to prevent "wrongful deactivations"

Even if "wrongful deactivations" were a legitimate public concern, the Challenged Law is not a reasonable and appropriate means to address that concern. Courts in the Second Circuit apply the "principles identified in *Blaisdell* and its progeny" to evaluate this factor. *Melendez*, 16 F.4th at 1038 (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). Applying the *Blaisdell* factors makes clear that the Challenged Law is neither reasonable nor appropriate, much less "specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).

First, and as discussed above, because the Challenged Law is permanent and applies retroactively, it thoroughly destroys Lyft's contractual rights. "This not only demonstrates a significant impairment of contract, but also weighs heavily against a [] determination . . . that means so destructive of contract rights are reasonable." *Melendez*, 16 F.4th at 1039.

14

Second, the Challenged Law is not an "appropriate means" for preventing wrongful deactivations. For example, there is no logical connection between keeping offending drivers on the platform for 14 days and the goal of preventing wrongful deactivations. The City did not fill in these gaps during the legislative process, failing to provide any "record basis to link purpose and means," *see DoorDash*, 692 F. Supp. 3d at 294, such as any evidence that the notice procedure or compelled reports would somehow reduce "wrongful deactivations." The City also failed entirely to justify the Law's retroactive application with, for example, any data to suggest a chronic "wrongful deactivation" problem stretching back to 2019. Because the City's decision to apply the law retroactively was arbitrary, the City deserves no deference that the means it chose were reasonable and appropriate to address "wrongful deactivations." *See Melendez*, 16 F.4th at 1041 ("While we defer to legislative judgments about the means reasonable and appropriate to address a public emergency, such deference is not warranted in the absence of some record basis to link purpose and means.").

Third, the Challenged Law allocates enormous cost and burden to Lyft. Under the Retroactive Provision, for example, Lyft will have to shoulder immense costs and resources to reinvestigate and re-adjudicate years-old deactivation decisions and justify them against a new "just cause" standard and a new burden of proof that previously did not exist. The Challenged Law also does not seek to compensate Lyft for these losses, which is "further reason to question the reasonableness and appropriateness [of it]." *DoorDash*, 692 F. Supp. 3d at 295.

Fourth, "adding to the reasonableness concern is the fact that the [Challenged Law] is not conditioned on need." *Melendez*, 16 F.4th at 1043. While the Challenged Law purports to address "wrongful deactivations," it authorizes driver reinstatement for any violation—even technical

violations that have nothing to do with the merits of the deactivation. *See* § N.Y.C. Admin. Code 20-1208(c)(1) (authorizing reinstatement for each violation of the Deactivation Prohibitions).

Because the City has failed to justify this severe impairment of private contracts, the Challenged Law violates the Contract Clause and should be enjoined.

**B.      The Retroactive Provision Violates Due Process**

The Challenged Law independently violates the Due Process clauses of the United States and New York Constitutions because it irrationally and arbitrarily imposes retroactive liability without any rationale for either the retroactive effect generally or the seven-year lookback period in particular. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USA Film Prods.*, 511 U.S. 244, 265 (1994). Retroactive legislation undermines that interest "and presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *Eastern Enters. v. Apfel*, 524 U.S. 498, 533 (1998). This is particularly true for new laws that "affect [] contractual or property rights, matters in which predictability and stability are of prime importance." *Regina Metro. Co. v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 382 (2020) (per curiam) (quoting *Landgraf*, 511 U.S. at 271).

The Due Process clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf*, 511 U.S. at 266. Retroactive legislation "must meet the test of due process" on its own terms, which is satisfied when the "retroactive application of the legislation is *itself* justified by a rational legislative purpose." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984); *see also Regina Metro*, 35 N.Y.3d at 375 ("[R]etroactive application of a newly enacted provision must be supported by a legitimate legislative purpose furthered by rational means."). Given the fairness concerns implicated by

16

retroactivity, "the justifications for [prospective legislation] may not suffice for [the retroactive aspects]." *R.A. Gray & Co.,* 467 U.S. at 730.

Here, there is no discernable rationale for the Challenged Law's retroactive application. Despite years of hearings and several committee reports, the Council never explained why the Challenged Law needed to apply backwards at all, much less for seven years (which far exceeds any conceivable statute of limitations under New York law).[4] It did not identify a history of "wrongful deactivations" dating to 2019 to attempt to justify retroactive application as integral to the Challenged Law's purpose. Nor did it claim that retroactivity was required to prevent platforms from racing to deactivate drivers during the legislative process—which, even then, could only potentially justify a "brief, defined period" of months, not seven years. *Regina*, 35 N.Y.3d at 376. And if the legislative record could not support the existence of a "wrongful deactivation" crisis sufficient to justify the Law's prospective effect, it falls well short of justifying its retroactive application. *See Landgraf*, 511 U.S. at 266 ("[A] justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application.").

The lack of any legitimate purpose is compounded by the absence of any forewarning. Even in the tax context, where "retroactivity is more tolerable," *Regina*, 35 N.Y.3d at 376, courts invalidate retroactive legislation where the affected parties "had no warning and no opportunity at any time . . . to alter their behavior in anticipation of the impact of the [challenged legislation]." *James Square Assocs. LP v. Mullen*, 21 N.Y.3d 233, 248 (2013) (32-month lookback "excessive and weighs against the State"); *see also AmerisourceBergen Drug Corp. v. New York State Dep't of Health*, 227 A.D.3d 1286, 1294 (3d Dep't 2024) ("15 ½-month period of retroactivity and the

---

[4]    *See, e.g.*, CPLR 213(2) (6-year statute of limitation for contract claims); CPLR 214(5) (3-year statute of limitation for personal injury claims).

17

lack of forewarning to plaintiffs . . . is violative of plaintiffs' substantive due process rights."). Here, Lyft had no reason to expect that seven years of contractually-supported deactivations could be retroactively reviewed and challenged under a new and different standard.

The magnitude of retroactive liability imposed by the Challenged Law underscores its fundamental unfairness. "[R]etroactive legislation that reaches particularly far into the past and that imposes liability of a high magnitude relative to the parties' conduct raises substantial questions of fairness." *Regina*, 35 N.Y.3d at 385 (quoting *Eastern Enterprises*, 524 U.S. at 534). Lyft and drivers have settled thousands of deactivations over the past seven years under transparent contractual standards. By making these deactivations subject to challenge and reversal under new standards, the Challenged Law "upends [Lyft's] expectations of repose relating to conduct that may have occurred many years prior." *Id.* at 379; *see also id.* at 382 ("[W]hen the governing law . . . is altered retroactively years later, long after the expired contracts have been performed, the impact on contract rights is unusually significant."). The Law's retroactivity also threatens to impose disproportionate liability and costs on Lyft, which may face petitions from thousands of deactivated drivers, all for simply exercising its lawful contractual rights. The result is the imposition of "severe retroactive liability on a limited class of parties that could not have anticipated the liability" in an amount "substantially disproportionate to the parties' experience"— precisely the combination the Supreme Court has held violates due process. *Eastern Enterprises*, 524 U.S. at 528-29.

## II.     LYFT WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION

Lyft is also "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm exists if, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they

previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). A plaintiff need show only "a *threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). Lyft will suffer irreparable harm in multiple ways.

First, "[w]hen an alleged deprivation of a constitutional right is involved," "no further showing of irreparable injury is necessary" to secure a preliminary injunction. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citation omitted). Indeed, the Second Circuit has held that the mere *possibility* of a violation of constitutional rights is sufficient to demonstrate irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." (emphasis in original)). Because Lyft is likely to succeed on the merits of its constitutional claims, the Court can conclude that the Challenged Law threatens irreparable harm without further inquiry. *See id.*

Second, regardless, the Challenged Law threatens to irreparably damage Lyft's user relations, reputation, and goodwill. These harms are well-recognized as irreparable. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Can't Live Without It, LLC v. ETS Express, Inc.*, No. 17-CV-3506 (JSR), 2017 WL 4776741, at *2 (S.D.N.Y. Oct. 10, 2017) ("It is well recognized that the inability of a party to supply its products to customers as a result of a dispute will often result in a loss of goodwill sufficient to establish irreparable harm."). And here, the risk of these harms is neither speculative nor remote: Lyft's reputation and goodwill are inextricably linked to its safety efforts. Lyft's ability to maintain rider trust and deliver on its safety commitments will be undermined in ways that cannot be compensated by money damages.

19

III.     **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION**

In considering whether to grant injunctive relief, "[t]he Court should balance the equities to reach an appropriate result protective of the interests of both parties." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013). Absent a preliminary injunction, Lyft faces irreparable and continuous violations of its constitutional rights. The City, by contrast, "does not have an interest in the enforcement of an unconstitutional law" and would face, at most, a temporary delay in the enforcement of a novel regulatory regime. *725 Eatery Corp.*, 408 F. Supp. 3d at 470. In these circumstances, the balance of hardships favors Lyft. *See Mercado v. Noem*, 800 F. Supp. 3d 526, 579 (S.D.N.Y. 2025) ("[H]owever inconvenient compliance may be, the government suffers no harm from an injunction that merely ends unconstitutional practices or ensures that constitutional standards are implemented."); *Mitchell*, 748 F.2d at 807-08 ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding . . . that the balance of hardships tips decidedly in plaintiffs' favor.").

The public interest also strongly favors a preliminary injunction. The public has a strong interest in upholding constitutional protections and preventing government overreach, particularly when the overreach may imperil public safety. *See Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) ("Enjoining an unconstitutional regulatory scheme 'serves the public interest . . . because the Government does not have an interest in the unconstitutional enforcement of a law.'"); *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("[T]he public interest is well served by the correction of [a] constitutional harm.").

20

## **CONCLUSION**

This Court should enter an injunction that enjoins and stays the effective date of the

Challenged Law pending resolution of Lyft's challenges to its constitutionality.


Dated: New York, New York
      June 10, 2026

*/s/ Alexander C. Drylewski*
Alexander C. Drylewski
Jacob G. Lefkowitz
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Alexander.Drylewski@skadden.com
Jacob.Lefkowitz@skadden.com

*Counsel for Plaintiff Lyft, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT AND LOCAL RULE 7.1**

Undersigned counsel certifies that this Memorandum of Law complies with the Individual Practices' and Local Rules' limit of 8,750 words as it contains 6,332 words of text according to the undersigned's Microsoft Word count function.

                                                    /s/ Alexander C. Drylewski